

# NUMBER 13-23-00356-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

LEONARD RUIZ ECHAVARRIE, Appellant,

v.

THE STATE OF TEXAS, Appellee.

## ON APPEAL FROM THE 36TH DISTRICT COURT
## OF SAN PATRICIO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Peña
Memorandum Opinion by Chief Justice Contreras**

Appellant Leonard Ruiz Echavarrie challenges his conviction of continuous sexual abuse of a young child, a first-degree felony. *See* TEX. PENAL CODE ANN. § 21.02(b), (h). The jury assessed punishment at thirty-nine years' imprisonment. Echavarrie's sole argument is that there is insufficient evidence to sustain his conviction. We affirm.

## I.    BACKGROUND

Jane Doe,[1] the complainant in this case, was nineteen years old at the time of trial. From approximately 2009 to 2018, when she was five to fourteen years old, Doe lived with her father, mother, and brother at her maternal grandmother's house in Mathis, Texas. The house had three bedrooms and Doe's grandmother sectioned off the living room for herself as a fourth bedroom. Doe's family shared the master bedroom. Various people stayed in the other two bedrooms throughout the years, including Doe's cousin, Isabella, and Isabella's boyfriend, Echavarrie, who slept in one of the bedrooms from approximately 2012 to 2016.

Laura Rodriguez, Doe's mother, testified that her family moved into her mother's house so that her mother could help take care of the children while the couple worked. She testified that during this time she was employed as a correctional officer with the Texas Department of Criminal Justice and typically worked the graveyard shift from 6 p.m. to 6 a.m. and slept during the day. Her husband also worked as a correctional officer during the graveyard shift but held rotating jobs as a police officer and EMS worker during the day. Laura's mother worked during the day from about 7:00 a.m. to 4:00 p.m. and watched Doe when she came home. Laura said Isabella and Echavarrie were unemployed most of the time her family lived there, and they also helped watch Doe when they were home.

---

[1] To protect the identity of the complainant, we refer to her by the pseudonym given to her in the indictment. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process").

Doe's family moved out of her grandmother's house in Mathis between 2018 and 2019 and moved into their home in Beeville. In October 2020, when Doe was sixteen, Laura took her to the hospital for issues related to diabetes and possible pregnancy. The doctor, when performing the exam, found Doe had cut the word "fat" into her stomach. When Laura asked her about the scars, Doe revealed that Echavarrie had been molesting her since she was eight years old. Doe remained in the hospital for a few days due to issues with her blood sugar levels, but after she was released, "the police department made contact with" her and Laura. Laura testified that she never saw any of the alleged abuse, though she did notice that Doe was depressed throughout middle school and once told a counselor that she wanted to kill herself. She also testified that Doe's elementary school teacher reported an incident where Doe "had gotten two pencils in front of other students and had put one on top of the other like if they were having sex." At the time, she had no idea how Doe could have known "anything like that."

A couple of weeks after Doe's outcry, Laura took Doe back to the hospital for a sexual assault medical examination. Sandra Pardo, the sexual assault nurse examiner (SANE) nurse who examined Doe, testified that she found no trauma or scar tissue on Doe's genital area. Pardo explained that, even if abuse occurred, these findings would be normal because scarring or injuries to the genital area heal quickly. Pardo asked Doe about the abuse and recorded Doe's words verbatim in her medical report, which she read to the jury:

> "[Echavarrie] was doing stuff to me from when I was eight until I was [fourteen]. He did a lot. He did it a lot of times. He said we were going to play a game. When I was eight[,] he took me to my grandma's room. Like, he would put me on my stomach on the bed. He would start tickling me. I

3

felt something sharp going in me, in my front area (patient indicates female sexual organ by pointing) from behind. Like, he was behind me. He said, [']Don't tell nobody.[']

["]When I was in third or fourth grade. I was in my parents' room. He took me to his room. He would stop if he heard footsteps and pretend we were watching TV. He said we would play our game and turned me over and tickle me and stick his middle part (patient indicates genital area by pointing) in my front area.

["]When I was in sixth grade[, h]e put a blindfold on my eyes. It was around Halloween. He told me to open my mouth. Sometimes it was a lollipop. Then it was his middle part. I felt his skin. I just licked it.

["]The last time was when I was 14. We were having a family party. We needed ice. He wanted me to go with him to get ice. I didn't want to, but I didn't want people to think something was wrong. We went to his house. I told him I wanted to go to my friend's house that was next door. He said no, that he needed me to see something. We went upstairs. We did it again. He put me on my stomach on the bed, and he put it, his thing, his middle part in my front part from the back. I would say stop, but he would put his hand over my mouth. Every time after he did it, I would bleed."

Doe was also interviewed by Veronica Olivarez, a forensic interviewer with the Children's Advocacy Center (CAC). Olivares read her report to the jury, wherein Doe described similar incidents to those she described to Pardo. Olivarez testified that during the interview, Doe "was shaking and nervous," cried a lot, "looked down a lot of the time," and "was very quiet[ or] solemn."

Doe's father, Kenneth Rodriguez, learned about the sexual abuse allegations after Doe's outcry to her mother in October 2020. He never witnessed the abuse, but recounted one incident that, looking back, made him feel "uncomfortable":

One time I had gotten off from work from the police department, and when I walked into the house I went into [my mother-in-law's] room. I go, "Where are the kids?" And she said, "They are in [Echavarrie] and [Isabella's] room." So[,] I walked to the door. The door was closed, so I knocked, because, I mean—well, [Isabella] and them were all in there. I just didn't want to walk

4

in. And when I opened the door [Doe] was to my left. She was like on the edge of the bed on her knees and he was laying across the bed.

And I was like why in the [expletive] is this door closed? You know, and he really didn't give me a response. So[,] I told [Doe] to go to the other room. When we went into the other room I asked her, I was like, hey, has anybody been touching you or did he touch you or anything.

I shouldn't have done it [while] I was standing—I guess I should have got down to her level, you know. I was like kind of towering over her. I asked, and she said, no. But, I mean—but thinking back now, the emotions that she displayed were—and I didn't catch it [sic].

Kenneth also testified that during the timeframe of alleged abuse Doe "always lash[ed] out" and "cr[ied] on a whim."

Doe testified at trial and described the first instance of abuse when she was eight years old: "I was playing my [computer] games . . . And I am facing towards the window, so my back is towards the hallway, and [Echavarrie] just comes up to me and takes me to [my grandmother's] room and says we're going to play a game." Echavarrie took Doe into her grandmother's bedroom, laid her on her stomach on the bed, pulled down her bottoms and started tickling her. Doe said she then "felt something go inside [her]" and Echavarrie put "his private part" into her private part. Doe said that her grandmother was not home at the time and everyone else was probably not home or asleep in their rooms.

Doe stated that from ages eight to nine Echavarrie put "his private part in her private part" about ten to fifteen times. Between ages ten to twelve, and before Echavarrie and Isabella moved out, she said she could not remember how often he abused her "but it was like almost every day." She said Echavarrie primarily abused her in her grandmother's room when her grandmother was not home, but he also abused her about five to ten times in the kitchen. Doe described one of the incidents in the kitchen when

5

she was ten or eleven. She was playing computer games at night while everyone was asleep and went into the kitchen to get water or a snack. Echavarrie came into the kitchen and he "ben[t her] body on the counter," pulled down her bottoms, and "put his private in my private part."

Doe also stated that Echavarrie put his "private part" in her mouth approximately five to ten times from about ages eleven to fourteen. She said that this always occurred in her grandmother's room, and the first time this happened was on Halloween one year. She said Echavarrie blindfolded her and told her to open her mouth. Then he put candy, "like lollipops" into her mouth and asked her to guess the flavor. Then he put something that felt "like skin" into her mouth and told her to leave her "mouth open and suck on it."

Doe testified that the last incident of abuse occurred after Echavarrie had moved out of her grandmother's house, when she was between twelve to fourteen years old. Doe's grandmother was hosting a party at her house. Doe could not remember what the party was for, but she remembered that Echavarrie and Isabella had come to celebrate. At some point, Echavarrie was going to leave and pick up more ice for the party, and he asked Doe if she wanted to go. Doe testified that she "kept saying no, but everyone told [her] to just go." Echavarrie then took her to the bedroom in his apartment, laid her flat on her stomach, and "put his private in [her] private again."

Doe said she did not tell anyone about the abuse because she was afraid Echavarrie would hurt her or her parents. She further testified that, although she is underage, she drinks alcohol almost every day to cope with the memories of the abuse.

Echavarrie testified at trial in his defense. He said he lived off and on at Doe's grandmother's house and lived in various other places for weeks at a time. He contended that he was not unemployed and was never alone with Doe. Echavarrie said that, when he first moved in, he worked full time at H-E-B and then worked for a few years doing road construction work, which required him to travel to various locations in the state. He said he worked about "60 hours a week" and sometimes he "would have to stay out there for a week until the job was done."

Echavarrie denied all of Doe's accusations. He had "no clue" why she would make up the allegations but contended that Doe's father, Kenneth, was trying to prevent Echavarrie from having custody of his daughter, Loveigh. Evidence at trial revealed that in 2019,[2] when Loveigh was ten weeks old, she suffered a traumatic brain injury. Loveigh was removed from Isabella's and Echavarrie's custody, and Echavarrie was criminally charged for causing her injuries because he was the last person taking care of her before she was injured. He was later acquitted by a jury in 2021. In October 2020, Kenneth became Loveigh's "permanent managing conservator." Kenneth testified that he applied for custody of Loveigh because his mother-in-law did not want Loveigh to stay in foster care and she wanted Isabella and Echavarrie to maintain visitation rights. Kenneth also explained that he had some experience from his EMS position that was helpful for taking care of Loveigh's extensive medical needs. Kenneth testified that Loveigh is blind, "cannot voluntarily move her arms or her legs," has spasms, and uses "a feeding tube." Kenneth

---

[2] This evidence largely consisted of testimony from Marcelino Rodriguez, the prosecutor who tried Echavarrie's prior criminal case concerning the injuries to Loveigh in which he was acquitted. Marcelino was called as a witness by the State and summarized the evidence and witness testimony from the trial.

and Doe also testified on cross examination that, though Echavarrie was acquitted, they believed he was responsible for Loveigh's injuries. Kenneth and Doe denied that the allegations of sexual abuse were a ploy to keep Loveigh away from Echavarrie.

The jury convicted Echavarrie and assessed punishment as outlined above. *See* TEX. PENAL CODE ANN. § 21.02. This appeal followed.

## II.     SUFFICIENCY OF THE EVIDENCE

### A.     Standard of Review & Applicable Law

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In a legal sufficiency review, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021). We defer to the jury's role as the factfinder, which includes "resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

We measure the sufficiency of the evidence against "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and adequately

8

describes the particular offense for which the defendant was tried. *Id.* "To obtain a conviction for continuous sexual abuse of a child, the State must show that the defendant committed at least two acts of sexual abuse against a child younger than 14 years of age during a period of at least 30 days' duration." *Ramos v. State*, 636 S.W.3d 646, 651 (Tex. Crim. App. 2021) (citing TEX. PENAL CODE ANN. § 21.02(b)); *see Smith v. State*, 340 S.W.3d 41, 48 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (noting that, to convict under § 21.02, the evidence must establish there were "at least 28 days between the day of the first act of sexual abuse and the day of the last act of sexual abuse."). The uncorroborated testimony of a child victim alone is sufficient to support a conviction for a sexual offense. TEX. CODE CRIM. PROC. ANN. art. 38.07.

## B.    Analysis

By his sole issue, Echavarrie argues that there is insufficient evidence to support the jury's verdict. Specifically, he argues that "Doe's testimony [w]as so unreliable, no rational juror could find [he] committed the underlying sexual assaults beyond a reasonable doubt." He notes there was "[n]o physical evidence, forensic evidence, or medical evidence" to corroborate Doe's allegations, and no one in Doe's household noticed any bloody or missing underwear even though Doe testified that she bled after every incident of abuse. We note that Echavarrie does not dispute that Doe provided testimony at trial which, if believed, would directly support each element of the offense. *See* TEX. PENAL CODE ANN. § 21.02(b).

We disagree that Doe's testimony was so unreliable that no reasonable juror could have believed her. Her trial testimony was clear and direct, and consistent with the reports

9

she made to the forensic interviewer and the SANE nurse. In any event, it is well established that a child sexual abuse victim's uncorroborated testimony alone can be sufficient to support a sexual abuse conviction. TEX. CODE CRIM. PROC. ANN. art. 38.07(a); *Martinez v. State*, 178 S.W.3d 806, 814 (Tex. Crim. App. 2005); *Saldivar-Lopez v. State*, 676 S.W.3d 851, 859 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd). "Courts give wide latitude to testimony given by child victims of sexual abuse." *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (citing *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (en banc)). "The victim's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult." *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.). "There is no requirement that the victim's testimony be corroborated by medical or physical evidence." *Id.* (citing *Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. 2006) (noting that "[t]he lack of physical or forensic evidence is a factor for the jury to consider in weighing the evidence")).

The jury found Doe to be a credible witness in this case, and because the jury is the sole judge of witness credibility, we may not disturb that determination on appeal. *Stahmann*, 602 S.W.3d at 577. Echavarrie's defensive theory at trial was that he did not abuse Doe and she was lying about the abuse to prevent him from visiting or obtaining custody of Loveigh. By rendering guilty verdicts, the jury obviously rejected his defensive theory. *Braughton v. State*, 569 S.W.3d 592, 611 (Tex. Crim. App. 2018) ("[B]y its implicit

10

rejection of appellant's defenses in finding him guilty, the jury necessarily signaled its disbelief in this testimony as lacking in credibility. . . .").

We conclude that there was sufficient evidence to support Echavarrie's conviction so that a rational jury could find each essential element of the offense beyond a reasonable doubt. Echavarrie's sole issue is overruled.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
23rd day of May 2024.